Good morning, Your Honor. Peter Sessions on behalf of the Plaintiff and Appellant, Michael Ford. This is an heuristic case involving application of the Abusive Discretion Standard of Review. I know that the Court is familiar with the facts of this case from the briefs and is familiar with the law, not only from this case but I'm sure from many other heuristic cases. So I think I'd like to begin by discussing Montour v. Hartford, which was a case handed down by this Court in November of 2009. And in your remarks, would you also address the remedy you're seeking as to what you expect this panel to do if we accepted any of your arguments? Certainly, I'll address that up front. I think the Court has two options, well, three options if one of those options is affirmance, but I don't urge that option. But the two options would be either to do what the Court did in Montour, which is to reverse the case and order the district court judge to reinstate the benefits, as the complaint originally sought. Or the other option is to reverse again and remand with instructions to the district court to apply the standard of review correctly, because obviously one of our issues on appeal is that the standard of review was not applied correctly. And what is the standard of review? Let's talk correctly. Isn't it really the district court has a standard that they would really have an abuse of discretion standard? That's correct. The standard below, and we're not arguing that it should be any different, is the abuse of discretion standard. Those are the words, anyway. That's correct. And that standard of review is a slippery standard of review. This Court in its... Judge Schroeder would think it more slippery than me, maybe. And this is something that this Court wrestled with in its en banc opinion in Abatey, and also that the Supreme Court addressed recently in the Metlife v. Glenn case. And what both those cases have said is, yes, the correct standard of review is abuse of discretion, and, yes, we will apply a deferential standard of review in these cases. However, that deference can be adjusted based on evidence of conflict of interest that's present in the case. And, in fact, as I understand it, and this is why I'm focusing in a little bit, the real reason why we would address this standard or address this case in even a different standard of review is that the district court made a choice and applied a different standard of review in this case than Montour would have had it apply, and therefore we could look at that to no vote, correct? That's essentially what the Court did in Montour. What the Montour panel stated was that the district court had applied the abuse of discretion standard of review incorrectly, and because this Court reviews the lower court's application of the abuse of discretion standard of review to no vote, it proceeded to do that on its own. Well, what is the change? As you read Montour, what is it that the conflicted company did here that might change the application of the abuse of discretion standard in this case? Well, the issue that Montour addressed was one that had lingered after Abadian-Glenn, which was to what extent that the cases that predated Abadian-Glenn, to what extent were those cases still viable under the new regime? And Montour clarified that issue and said these older cases, specifically Boyd v. Bell, which the district court in this case relied on heavily, and Jordan, those cases, in cases like this one where you have an inherently conflicted claims reviewer, as an insurance company is, then Boyd and Jordan are no longer good law. And Montour went on to discuss several items of conflict of interest, and it really is remarkably similar, this case and Montour. There are multiple issues on point, and I'd like to address those. First of all, we have the same insurance company, Hartford, so it's not surprising that we have the same kinds of claim review and conduct under review here as in that case. We have the same kind of injury, which is a lower back injury with a knee impairment, and the district court, as we already talked about, relied on Boyd v. Bell, as the district court also did here. In Montour, you had a, quote, pure paper review of the claimant's claim. In other words, there was no independent medical examination ordered. There was no functional capacity examination. In other words, a kind of direct. Now, wait a minute. No functional capacity. There was one, and then they tried to set up another, and your client refused to show up? At that point, yes, there was some talk about conducting an additional functional capacity examination. But my client was reluctant to engage in the functional capacity evaluation because the communications between Hartford and him had already broken down at that point. Well, okay, but you cited that as a parallel to Montour, and it seems to me that if your client, for whatever reason, declines to do, what weight should we give that, you know, in your favor if he decided not to participate in it? Well, I understand. And there actually was a functional capacity evaluation done prior, at the beginning. Yes, because then they paid benefits, didn't they? Right, and they did pay benefits at that time. Another parallel that we can find in Montour is that there is no evidence in this record that the physicians were provided with Social Security findings. And finally, there's a- Now, again, I may be confused on the timing. Social Security was pre-surgery? Well, there were two surgeries, but- They awarded benefits pre-surgery, right? That's right. He had been receiving them for several years. And so did Hartford, didn't it? I'm sorry? Didn't Hartford as well?  So in that, they were in tandem. So where is the disconnect, then, post-surgery? Well, Social Security continued to pay benefits even after the surgery, whereas Hartford did not. Okay. And the last item, which is- You know, under Social Security, there's a proviso that sometimes under Social Security, you have to go back and establish whether or not you continue to be disabled. Was that ever invoked in this case? That's right, and I don't know the answer to that question. It's not in the record. So we don't know whether Social Security would have post-operation had an occasion to reevaluate. That's true. I'm just trying to figure out what- I might affirm for a moment. We'll let the other side explain that, why we should do that. But if I understand that this case was briefed before Montour, right? The district court decided this before Montour when there was a different standard of the reasonable basis or something like that. Well, yes and no. Our position is that the standard of review was changed by Abatey and Glenn, which had both been handed down at the time the decision in this case was made. Montour merely clarified that change in the opinion. Well, Montour was our first decision after Glenn. Is that right? I believe it's the first published decision. Published decision, yes. Presidential decision. And the district court did not have the benefit of Montour. That's correct. And it did have Glenn or it did not? It did. Okay. And this case was not briefed in light of Montour. That's right. Okay. So would some of these differences between this case and Montour be able to be clarified in the district court better than they would here or not? Well, our position is that the district court shouldn't have needed Montour in order to make the kinds of conclusions that we're arguing in our briefs. Obviously, Montour would have been helpful to the district court in making a decision, and it might even have led to a different outcome. But our position is that regardless of Montour, Montour didn't create new law. It merely clarified for our RISA litigators and claim administrators what the correct standard was now in light of Glenn and the baby. It was more of a recapitulation than an announcement, is basically what I'm saying. And just to return to the similarities between this case and Montour, the last item I wanted to discuss was Herford's failure to discuss the Social Security findings in its denial letters. And I know that we've already talked about Social Security issues a little bit, and I know defendants have arguments for why the Social Security decision should or should not be given any weight in making a determination in this case. But the fact that Herford didn't even mention the Social Security decision at all, not even to distinguish it and explain why it wasn't relevant, I think is strong evidence of conflict of interest, and that's exactly what Montour says. And, in fact, this case is even more compelling than Montour, because in Montour Herford at least mentioned the Social Security decision in its appeal denial, whereas in this case the Social Security decision is not mentioned at all. Even though Herford required Mr. Ford to apply for those benefits, even though he was well aware that he was receiving those benefits, and, in fact, it profited from the fact that he received those benefits because he was able to use the Social Security benefits as an offset to reduce its payments to Mr. Ford. What do you do with the video surveillance? The district court said that Herford did not place improper emphasis on the surveillance videos, and the district court itself agreed with what the videos showed. What do we do with that finding? Well, this is another issue that Montour actually addresses. And Montour specifically says, quote, and this, of course, is referring to the Montour facts, not these facts, but, Herford strung together a laundry list of discrete activities observed over the course of four days, suggesting the plaintiff was capable of sustaining those activities throughout the day, as would be required in a sedentary occupation. However, that plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he is capable of sustaining activity in a full-time occupation. And the activities that were involved in Montour were very similar to what happened in this case. You had a plaintiff who was performing occasional errands, picking children up from school, going to a pharmacy. These are exactly the kinds of things that Mr. Ford is doing in this case. And one thing that is present in this case that isn't present in Montour is the fact that there were five days of surveillance, and on two of those days of surveillance, even though Mr. Ford was confirmed to be in his house, he didn't leave the house, which should be strong evidence of his disability. And one other item regarding surveillance I would mention is that the activity Mr. Ford was involved in, as Herford should know, was pretty atypical for him, because they'd done surveillance on him before, and they had found that he hadn't involved himself in much activity. And the reason that his activity was atypical was because Mr. Ford is a single parent, and he's preparing his family to move to California, so he's making many trips. What was he carrying? He was limping. What was it that he was carrying? The items that he was carrying were very small and very light. He was carrying foam-packing peanuts. He was carrying empty folded-up boxes. At one point he went into, I believe, a Walmart and was carrying a small white bag. The items he was carrying were very light. And so the – Can I ask you one more thing, because your time is going? Sure. You said that the district court should have been able to divine from Glenn the proper standard here without any help from us. What do you find helpful in Glenn as a – because I'm having a little trouble finding something that's very definitive in it. Well, I would say less Glenn and more Abeyte. And Abeyte is an Nth Circuit en banc opinion, which was also predated this decision. And Abeyte goes into how to apply standard review in a lot more depth than Glenn does. And specifically what Abeyte does is say that Jordan, which is one of the cases cited by the district court, is no longer good law. And so our position is that the district court should have read Abeyte and concluded, well, if Jordan is no longer good law, then Boyd v. Bell, which says essentially the same thing, is also no longer good law, and I should not be relying on that. But instead what the district court did was go on not only to rely on Boyd v. Bell, but essentially structure the whole opinion around the holding in that decision. The Boyd decision presents a three-part test, and the district court's opinion in this case tracks three prongs of that test. Boyd says that an illicit administrator abuses its discretion only if it renders a decision without explanation. That's one. Two, construes provisions of the plan in a way that conflicts with the plain language of the plan. Or three, relies on clearly erroneous findings of fact. And what the district court in this case said was that the nature, this is a quote, the nature of the deferential standard of review is delineated in Boyd v. Bell. So this is not a stray citation to an authority without any reliance. The court specifically said this is the standard of review. Boyd v. Bell tells me how to do it. And then, as I said, the court goes on to track the language exactly in applying that decision. I'd like to reserve the remaining four seconds. Thank you. Good morning, Honors. Michael Bernacchi for Appellees, Hartford Life and Accident Insurance Company, the Brown and Sharp Long-Term Disability Plan. I'd like to start off by indicating that plaintiff's main argument is that the district court misapplied the appropriate standard of review. That only works if you don't read the district court's order. They did a good job of defining the district court's order in their briefs, especially in their reply brief. And I apologized for that. I thought it was obvious, and so I didn't spend probably as much time quoting from the district court's order as I should have. Judge Wu was very much aware of a body and Glenn. In fact, he ordered comprehensive post-hearing briefing on the issue of conflict of interest. He did he issued a approximately 20-page opinion. Ten pages of that was an analysis. That analysis went into whether or not Hartford's decision was correct. In reaching his conclusion, and I want to quote from it, in the analysis section now, Judge Wu stated, in deciding that actually on page 15 of his ruling, and on the record, it is ER 17, 17. Well, he does say on ER 15 that the nature of the differential standard of review is delineated in Boyd v. Bell. He does do that. And that's under the applicable law. And to be honest, I want to get, because I want to make two points. Well, wait. What part of it are you relying on? I was going to quote. I think I quoted page 17. In deciding that plaintiff could do sedentary level duty work and hence did not remain disabled from any occupation, Hartford relied inter alia upon, one, the results of the back surgery. Two, the lack of post-surgery objective medical documentation such as radiographic studies of nerve root compression or displacement or functional capacity studies to support any claimed impairment. Three, the two independent medical reviews by Drs. Gupta and Pick. Four, the surveillance videos. And five, the assessment of employability by Dyson. Such material constitutes substantial evidence upon which Hartford could base his decision herein. Now, Judge Wu did cite Boyd and Jordan. I'm not sure that's really improper. If you read Montour, Montour merely states that if you're going to use Boyd and Jordan for the or to describe abuse of discretion under the old Atwood standard, which is if you have material appropriate evidence of a conflict, then we're going to weigh that. Then it's going to be de novo. But if you don't, then we're going to apply a pure abuse of discretion standard. It is wrong. But there is nothing wrong with those opinions to simply describe an abuse of discretion standard of review. And that's what Judge Wu did. It's in the applicable law section. It's not anywhere else. With respect to the conflict of interest, Judge Wu, if you look at his opinion, and I believe that's on page 18, which would have been page 20 in the ER, he has a whole section involving the potential conflict of interest. He specifically goes into all of the arguments the plaintiff was raised during the post-hearing briefing pursuant to the Glenn case and the Abadie case. He indicates that he is basically presuming a conflict of interest as required by Abadie because Harford is both the plan administrator and the plan funder. Judge Wu also indicates, and it's indicated in Glenn, that he's got to take that into consideration. At the end of that section, what does Judge Wu do? Judge Wu comes back and says, after considering all of this evidence, the evidence and the resolution of issues in this case are not so close that the conflict of interest would play a determinative role in its outcome. This is exactly what you instructed the district courts to do in your Abadie decision, an en banc decision. I don't see how Judge Wu can be faulted for doing anything other than what he did in reaching his conclusions. I'd like to discuss a little bit the Montour case because I think there are distinctions. First off, as I read Montour, and it's a little bit confusing, but I think that the Ninth Circuit was quoting from the district court's opinion. The district court found that there was a conflict that appeared to permeate the entire process of Harford's claims adjudication with that particular case. However, the district court in Montour said, because this is a pure abuse of discretion standard, if I find any reasonable basis, I'm going to go ahead and uphold the decision. The Ninth Circuit, you said, no, that's incorrect. That is not consistent with Abadie. In this case, Judge Wu took the conflict of interest into consideration. Judge Wu looked at it, basically, and didn't find it to be this positive. In fact, he went over each argument the plaintiff made during the hearing that would warrant finding a conflict of interest. He analyzed each one. So this is distinction. This is completely distinct from Montour. Judge Wu didn't find a substantial conflict of interest. Moreover, he applied almost a substantial evidence test to determining that Harford's determination was correct. The other problem with Montour. I don't see any tension here between Montour and what the district court did here. No. No, Montour actually said that looking at all these factors, including the Social Security and everything else, that he's entitled to benefits. Well, I do. I will say some of the facts are similar between Montour and this case in terms of the claims made. But I think the results reached are completely different. For example, in Montour, the district court took issue with the fact that the treating physicians that Harford retained seemed to overemphasize what he was doing on the surveillance. I would argue in this case, and I think Judge Wu found that, that if anybody was overemphasizing the restrictions and limitations of Mr. Ford, it was his treating physician, it was workers' compensation doctor, Dr. Rogers in Texas. When Dr. Rogers, and this is in the record, first started treating Mr. Ford, and I think this was November of 2000, he indicated that Mr. Ford, after only six months, and Mr. Ford only being 42 years old, would probably never return to work again. Now, Dr. Magnese, who was his spinal surgeon, that had examined him only a couple months earlier, merely indicated that Mr. Ford couldn't go back to his own occupation. In May of 2001, Dr. Rogers sits there and says, Mr. Ford can barely ambulate on his own power, and also will most likely be wheelchair-bound. We did surveillance four or five months later, and Mr. Ford was out there walking around, certainly able to ambulate on his own power, and certainly not in a wheelchair. On May 29, 2005, right around the time we were investigating the claim and possibly terminating benefits, Dr. Rogers saw Mr. Ford in his examination room, said Mr. Ford had severe pain in his back, and the only way to get relief was to lay down during the examination. We happened to be surveying Mr. Ford right after that. Mr. Ford came out of the office and for three hours engaged in a variety of miscellaneous errands. He was shopping. He was carrying things. You ask what he was carrying, one of the things he was carrying apparently was cardboard boxes, and when you're lifting them like that, those can be quite heavy. Yeah, well, okay. Did Hartford do a personal evaluation? That's the other thing. In terms of a meaningful dialogue, I'm not sure what you mean by personal evaluation. In terms of an interview with him, we tried to set one up. Mr. Ford declined. Before we terminated benefits, we contacted him and said, we want to meet with you. Mr. Ford said, I'm not going to meet with you. You can meet with my attorney. You didn't have a doctor? We did not. And you didn't ask for him to meet with a doctor? We did not. We could barely set up an interview with Mr. Ford. One of the things, and that is something that Montour raised, and you are right. Montour said, you know, you could have had an independent medical examination, but I think what the court in Montour found, though, was in this particular case, we find the treating physicians' reviews and opinions to be a little bit more persuasive than paper reviewers. However, in this case, the reviewers we had, and this is important to remember, were an occupational rehabilitation specialist, I mean, occupational medicine specialist, Dr. Gupta, and Dr. Pick, a board-certified orthopedist. Their reasons for finding that Mr. Ford wasn't disabled are articulated in their reports. Conversely, Dr. Rogers is a pain management specialist. And so I think, as the district court found, his opinions were all over the place. He, I guess in early October of 2004, called the operation a complete failure, and this is in the district court's order, and then a mere two weeks later indicated that the operation was a complete success and prognosis was highly likely to be very successful. Dr. Rogers, again, was all over the place, and I think it's telling that when Mr. Ford went to California, and remember, he went to California to seek employment, and I think that's very important. He didn't try to, when he was appealing our decision to terminate benefits, use the doctors out in California. He flew back to Texas to get a report from Dr. Rogers. So I think, once again, there is substantial evidence. Montour really doesn't apply in this particular case. With respect to the Social Security disability findings, we didn't reference that in the letter, I admit that. The circumstances have changed. There is case law out there. I mean, there's the Hobson case, I think, out of the Second Circuit, which says that's not necessary. But I think the argument by Mr. Ford and his counsel is symptomatic of something that's a little bit more important that I kind of want to raise right now, which is because of all the opinions focusing on procedure and focusing on conflict of interest, the actual issue of disability down below in the district courts and the mediations is really almost becoming irrelevant. I mean, I'm not saying that, but, I mean, everybody's arguing procedure. I think this is a good case to reemphasize a body. A body, in the Embank opinion, always said you take these things into consideration. You take procedural errors into consideration. You take conflict of interest into consideration. However, these things shouldn't be dispositive unless there's exceptional circumstances that would warrant that. Now, in Montour, the court found that there was exceptional circumstances in that particular case. However, in most situations, something like not referencing a Social Security Disability Award that was two years older, that was three years old, based on material different facts, and also, I'm sure the Social Security Administration didn't know that Mr. Ford had moved to California to actively seek employment, I think is no grounds for remanding this case back to the district court. There are other issues, but if you guys have any particular questions. Well, I have one question, and that is, if I find, after reading the district court's opinion, that it would have helped the district court to appropriately apply the standard of review to this case, given a Montour v. Hartford decision that came out and pretty well laid out what they were supposed to do, what should I do at that point in time, in your opinion? I mean, I know your argument is he did everything he was supposed to do, given all the cases, and even given Montour. I know that's your argument, but what if I disagree? What if I suggest that, hey, if I'd have been the district judge and I'd have had Montour, I would have approached it with a different view, given the conflict of interest. I'd have said, we've got to have enhanced skepticism as it relates to that conflict of interest, rather than the kind of things that this judge said based on the other cases that he had. Enhanced skepticism about the SSA disability determination. Talk about that. Think about it a little bit. What about the medical evaluation or relied on pay-per-view? I don't know that that has a lot to do with this case. But if I go through there and I find that I'm worried that the district judge really needed the correct standard, what should I do then? Should I remand or should I just decide it? I would argue, based on the facts, that under any standard, I think that if you read the district court's opinion, even under DeNovo's standard, you would have filed for Hartford. My question is, what should I do? Well, that was his answer. Just DeNovo it and then affirm. I think you should affirm for Hartford, actually. So you're saying we should keep it and make the decision ourselves? Well, I think that... I don't know whether you want to do that. I think you should do what's ever best for Hartford. I mean, that's the ultimate question. But I think that's the problem with citing Montour and applying it. If you're going to have just, and that's something else I'm talking about, what you seem to be indicating that Montour is just a checklist. And what you're going to have if you start going by this checklist is insurance companies saying, we're bulletproof, who cares if this person's disabled. We had an IME and we referenced the Social Security award in our denial letter. Conversely, what you're going to have is, if they don't do that, is plaintiffs coming back and saying, look it, who cares if my client's disabled. You guys failed to reference the Social Security award. And I do think that's in danger. I don't think that what's happening is the briefing on all these cases is taking a big turn. It's becoming 70% procedure, 30% factual disability. All of that said, you didn't answer my question unless the answer was decided. Well, I think that if remanding it back to Judge Wu is beneficial to Hartford, I think we should remand it back to Judge Wu. If keeping it up here is beneficial to Hartford, I think we should keep it up here. Thank you. Thank you. What is the answer to the question? We're trying to create some rationality, predictability, understandability in the law. What is the answer to the contention that if we're in danger of making this into a checklist, we just do this, do that, do that? Well, I don't think that's true, Your Honor. Ultimately, obviously the question is in cases like this whether the claimant is disabled or not. But Abatey and Glenn are quite clear that conflict of interest issues are important in these cases. And, in fact, Glenn specifically says in cases where the evidence appears to be 50-50ish, the conflict of interest can be, quote, a tiebreaker in these kinds of cases. And so the idea is, look, we'll give deference to these claim administrators, but to the extent that they are doing the kinds of things that we see in Montour, then that degree of deference is lessened. And when there's evidence of disability, as there was in this case, considering the fact that they paid him for more than five years and there's no dispute that he has a back condition, the question is just how disabling it is. I'm sorry. A tiebreaker, what case do you say tends in that direction? Glenn says that. Glenn, you think that. Right. Okay. So I don't think we're in any danger of landing in this dystopian world where there's checklists. And certainly the kinds of things that are in Montour are easy for insurance companies to fix. And so I don't think they have any grounds for complaining about considering Social Security reviews, which is something they should be doing all along anyway. The Ninth Circuit shouldn't have to tell them to do that. Okay. You have used your time. Okay. Thank you, Your Honor. Thank you. Thank you both. Thank you. Good argument. Before hearing the next case, the Court will take an eight-minute recess. All rise.
judges: Schroeder, Fisher, Smith N. R.